IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SHIONOGI INC., ET AL., | : | CIVIL ACTION |
| | : | |
| *Plaintiffs,* | : | |
| | : | |
| v. | : | No. 17-cv-072 |
| | : | |
| AUROBINDO PHARMA LTD., ET AL., | : | |
| | : | |
| *Defendants.* | : | |
| | : | |

Goldberg, J.                                                          January 31, 2019

### Memorandum Opinion

Plaintiffs, Shionogi, Inc. ("Shionogi") and Andrx Labs, LLC ("Andrx"), have brought claims arising under 35 U.S.C. § 271 against Defendants, Aurobindo Pharma Ltd. and Aurobindo Pharma USA, Inc. (collectively "Aurobindo"), for allegedly infringing two of Plaintiffs' patents. Defendants have filed counterclaims, alleging the invalidity and non-infringement of these patents.

Plaintiffs urge that all of these claims were settled and have filed a Motion to Enforce Settlement. For the reasons set forth below, I find that Plaintiffs have failed to sufficiently establish the existence of a settlement agreement, and I will accordingly deny Plaintiffs' Motion.

## I.     FACTUAL BACKGROUND

### A. Patents at Issue

On January 25, 2017, Shionogi and Andrx sued Aurobindo, alleging that Aurobindo infringed on United States Patent No. 6,790,459 (the "'459 Patent") and United States Patent No. 6,866,866 (the "'866 Patent"). (Compl. ¶ 1.) For purposes of deciding the Motion to Enforce Settlement, the Complaint alleges the following pertinent facts:

– Andrx owns the '459 and '866 Patents, which are sold by Shionogi as the exclusive license holder under the tradename FORTAMET®.  (Id. ¶¶ 24–27.)

– FORTAMET® is an oral tablet that helps improve glycemic control in adults with Type 2 diabetes.  (Id. ¶ 26.)

– Aurobindo submitted an Abbreviated New Drug Application ("ANDA") to the Food and Drug Administration ("FDA"), seeking approval for the commercial manufacture, use, and sale of Metformin Extended Release Tablets.  (Id. ¶¶ 29–31.)

– Plaintiffs allege that these tablets infringe on the '459 and '866 Patents because the tablets are the "bioequivalent" to FORTAMET® with the same active ingredient, method of administration, dosage, form, and strength.  (Id. ¶ 31.)

**B. Shionogi and Aurobindo's Settlement Negotiations between February 2017 and May 2018**

As will be set out in detail below, the parties discussed numerous possible settlement terms over the course of fifteen months, all of which are set forth in e-mail exchanges and alleged draft settlement agreements.  While Plaintiffs point to one specific e-mail exchange occurring in April of 2018 as forming a binding contract, recounting all of the e-mail negotiations leading up to that point is necessary to gain a full understanding of whether a binding contract was formed.

On February 10, 2017, Shionogi and Aurobindo began settlement negotiations, whereby David Bassett, Esq. represented Shionogi and Steven Moore, Esq. represented Aurobindo.  (Pls.' Mot. to Enforce Settlement Agreement Ex. 1, at 1, ECF No. 64.)  It is important to note that Andrx was not involved in these initial negotiations.

Shionogi and Aurobindo did not engage in substantial negotiations until September 13, 2017 when Mr. Moore e-mailed Mr. Bassett regarding the potential settlement of the pending Inter-Party Review ("IPR") Proceedings.[1]  (Id. Ex. 2, at 10.)  Mr. Bassett responded that same day with Shionogi's first proposal:

---

[1]     An IPR is a procedure for challenging the validity of a United States patent before the United States Patent and Trademark Office.



"[A]n entry date for Aurobindo in ███████, with a ██% royalty and a $██M quarterly minimum (i.e., or any quarter where the ██% royalty payment is less than $███ Aurobindo will pay $███ for that quarter), through ██████, the expiration date of the asserted patents. Thus, under this proposal, Aurobindo would be making royalty payments from ██████ through ████, which is ████ quarterly payments." (Id. at 9.)

On September 15, 2017, Mr. Moore e-mailed Mr. Bassett, raising two questions about Shionogi's September 13th proposal:

Couple of questions from my client: 1. What would the royalty rate have been for the ████████ date? 2. Why is Shionogi so concerned as to another launch at an earlier date given that Lupin and Teva from marketing data appear to have taken over the market? They propose a royalty rate in the approximately ██% range which they feel would fly with upper management if they get a launch in the first half of ████. On the other hand they feel the royalty rate you note below may be viable if they get an entrance date in the last half of ████. I hope we can get this done. (Id. at 7.)

On September 16, 2017, Mr. Bassett e-mailed to Mr. Moore, conveying that Shionogi was "growing a bit frustrated" and "would like a real counter-offer with a firm date, rate, and minimum. Not approximate rates and loosely defined dates and silence on the minimum." (Id. at 8.) On the same day, Mr. Moore agreed to have Aurobindo put counteroffers in writing. (Id.)

On October 4, 2017, Mr. Moore e-mailed Mr. Bassett, advising that Aurobindo suggested the following terms: "[DATE REDACTED] – ██% royalty on profit with █████ quarterly minimum through [DATE REDACTED] or last to expire patent whichever is earlier. Of course this is negotiable as well." (Id.) On October 17, 2017, Mr. Bassett responded that Shionogi's October 4th "offer" did not reflect Aurobindo's willingness to pay "more than anyone else." (Id. at 7.) In light of this "inconsistency," Shionogi made a "counteroffer that is more consistent with those previous statements by Aurobindo: entry on ██████ with a ██% royalty rate and a $███ quarterly minimum." (Id.) On October 27, 2017, Mr. Moore responded to Mr. Bassett's October

17th e-mail with a "counterproposal" of "[DATE REDACTED] - ██% royalty with a ██ million

quarterly minimum through ██, or last to expire patent, whichever is earlier." (Id. at 6–7.)

Throughout November and December, the parties continued to submit "proposals" to one

another, relating to four specific terms: (1) Aurobindo's entry date into the market, (2) the royalty

rate, (3) the terms of a quarterly payment, and (4) a notice provision in the event that Aurobindo

withdrew from the United States market. (Id. at 2–6.) On December 11, 2017, Mr. Moore advised

Mr. Bassett of the following:

> I understand that [Aurobindo has] signed off on the royalty rate and minimum. The
> one sticking issue is the ████████ notice provision. If we could do ████████ of
> notice, I understand we will likely have a deal. They will be getting back tomorrow
> after they finish running the figures, but it appears this will work. (Id. 3.)

Despite Mr. Bassett's several e-mail inquiries as to Aurobindo's status, Mr. Moore did not respond

with an update. (Id. 1–3.)

On January 19, 2018, Mr. Bassett sent an e-mail to Mr. Moore, advising him of Shionogi's

position:

> Shionogi believes that the parties are close enough on the terms of settlement that
> we have drafted a proposed settlement agreement (attached). Shionogi is ready to
> sign this agreement with Aurobindo. This draft is intended to reflect each of the
> terms to which the parties have agreed, plus other standard provisions. (Id. at 1.)

The January 19, 2018 Draft Agreement contained twenty-four pages, including signature pages

and placeholders for exhibits. (Id.) The January 19, 2018 Draft Agreement further stated that the

"parties" to the agreement were Shionogi, Andrx, Teva Pharmaceuticals USA, Inc. ("Teva"),[2] and

Aurobindo. (Id. Ex. 3, at 1.) The January 19, 2018 Draft Agreement provided for the voluntary

withdrawal of this lawsuit, the IPR Proceedings, and all existing legal and equitable claims existing

---

[2]     Teva is not a party to this lawsuit. However, during the Oral Argument held on July 19,
2018, Mr. Bassett advised that Andrx is wholly-owned by Teva. (Oral Arg. Tr. 20, July 19, 2018.)

at the time of this Agreement that relate to Aurobindo's ANDA, the '459 and '866 Patents, current

pending litigation, or Aurobindo's generic product.  (Id.)  Additionally, this Draft Agreement

contained a ██% royalty rate and a Minimum Payment of ████████ that would be paid quarterly

through the earlier of ██████████, the expiration of the '459 and '866 Patents, or the

termination of the Agreement.  (Id. at 4, 11–12.)

Between January 19, 2018 and April 11, 2018, Mr. Moore did not respond to the January

19, 2018 Draft Agreement, despite several communications by Mr. Bassett requesting a response.

(Id. Ex. 4, at 5–9.)  On April 12, 2018, Mr. Moore sent an e-mail to Mr. Bassett, which included a

redlined version of two sections from the January 19, 2018 Draft Agreement:

> Aurobindo has come back with a counteroffer. It is clear that the minimum payment
> Shionogi proposes is just too high for them, particularly given the number of
> competitors already on the market and the risks future sales entail. Aurobindo is
> asking Shionogi to make a bet on Aurobindo's success, and that the payment will
> be in the line of ██████ per month.

> 1.1     "License Start Date" means the earliest of: [DATE REDACTED]

> 6.1     Royalty.
> (a) Within forty-five (45) days following the end of each three-month period during
> the License Term, Aurobindo shall pay to Shionogi a royalty equal to the ~~higher~~
> **lower** of (i) ████████████████% of all Profit during such three month
> period (the "Royalty Rate") or (ii) ████████ $███████ ~~(the "Minimum~~
> ~~Payment")~~, provided that, if Shionogi subsequently grants during the License Term
> to any Third Party a license to sell a Generic Equivalent at a rate that is more
> favorable to such Third Party than the Royalty Rate, then Shionogi shall promptly
> notify Aurobindo of such rate and if Aurobindo agrees in writing to all other
> financial terms and conditions agreed between Shionogi and such Third Party for
> providing such more favorable rate (if any), then Aurobindo shall pay the more
> favorable rate in place of the Royalty Rate. For the sake of clarity, the ~~Minimum~~
> $██████ Payment is not subject to the most favored nations provision of this
> section 6.1(a). Shionogi's right to receive a share of Profits under this Section 6.1(a)
> shall expire upon the expiration, cancellation, invalidation or abandonment
> (whichever comes first) of the last Valid Claim.  (Id. at 4–5.)

On April 15, 2018, Mr. Bassett responded:

> Shionogi can accept Aurobindo's counterproposal and each of its proposed edits,
> except the change of "higher" to "lower."  Changing from a floor to a cap on
> royalties fundamentally alters the structure of the deal, is contrary to what your
> client has proposed from the start of the negotiations, and would make little
> economic sense for Shionogi. But with your client's other proposed changes, if we
> can keep the term "higher," rather than "lower," we have a deal.  (<u>Id.</u> at 4.)

On April 17, 2018, Mr. Moore sent an e-mail to Mr. Bassett with "yet another counterproposal" from Aurobindo, which included a redlined version of Mr. Moore's April 12, 2018 E-mail, with new changes indicated in red:

> 1.1    "<u>License Start Date</u>" means the earliest of: [DATE REDACTED]
>
> 6.1    <u>Royalty</u>.
> (a) Within forty-five (45) days following the end of each three-month period during
> the License Term, Aurobindo shall pay to Shionogi a royalty equal to the ~~higher~~
> ~~lower~~ **<span style="color:red">higher</span>** of (i) ▮▮▮▮▮▮▮▮▮▮▮▮▮% of all Profit during such three
> month period (the "Royalty Rate") or (ii) ▮▮▮▮▮▮ $▮▮▮▮▮▮ **<span style="color:red">provided</span>**
> **<span style="color:red">Aurobindo's Net Sales are at least</span>** ▮▮▮▮▮▮▮ **<span style="color:red">in such three month period</span>** ~~(the~~
> ~~"Minimum Payment")~~, provided that, if Shionogi subsequently grants during the
> License Term to any Third Party a license to sell a Generic Equivalent at a rate that
> is more favorable to such Third Party than the Royalty Rate, then Shionogi shall
> promptly notify Aurobindo of such rate and if Aurobindo agrees in writing to all
> other financial terms and conditions agreed between Shionogi and such Third Party
> for providing such more favorable rate (if any), then Aurobindo shall pay the more
> favorable rate in place of the Royalty Rate. For the sake of clarity, the ~~Minimum~~
> $▮▮▮▮▮ Payment is not subject to the most favored nations provision of this
> section 6.1(a). Shionogi's right to receive a share of Profits under this Section 6.1(a)
> shall expire upon the expiration, cancellation, invalidation or abandonment
> (whichever comes first) of the last Valid Claim. (<u>Id.</u> at 3–4.)

On April 18, 2018, Mr. Bassett sent an e-mail to Mr. Moore with "a counterproposal from Shionogi" that accepted the License Start Date of ▮▮▮▮▮▮▮▮, but rejected the $▮▮▮▮▮ Minimum Payment with the Net Sales Conditions, and instead proposed a $▮▮▮▮▮ Minimum Payment without the Net Sales Conditions.  (<u>Id.</u> at 2–3.)  On April 26, 2018, Mr. Bassett sent an e-mail to Mr. Moore that said: "Following up.  Will your client be responding to Shionogi's counterproposal?"  (<u>Id.</u> at 2.)

On April 27, 2018, Mr. Moore sent an e-mail to Mr. Bassett with the following subject line: "RE: 4-17-2018 1002 am EST COUNTEROFFER - SUBJECT TO FEDERAL RULE OF EVIDENCE 408 - Shionogi Inc., et al. v. Aurobindo Pharma Ltd., et al., Civil Action No. 1:17-cv-00072-MSG (D. Del.)." (Id.)  The e-mail stated:

Here we go David:

1.1      "License Start Date" means the earliest of: [DATE REDACTED] *(we are agreeing to delay launch by one more month)*

6.1      Royalty.
(a) Within forty-five (45) days following the end of each three-month period during the License Term, Aurobindo shall pay to Shionogi a royalty equal to the ~~higher~~ **lower** of (i) ███████████████ **%** of all Profit during such three month period (the "Royalty Rate") or (ii) ██████ $██████ (the "Minimum Payment"), provided that, if Shionogi subsequently grants during the License Term to any Third Party a license to sell a Generic Equivalent at a rate that is more favorable to such Third Party than the Royalty Rate, then Shionogi shall promptly notify Aurobindo of such rate and if Aurobindo agrees in writing to all other financial terms and conditions agreed between Shionogi and such Third Party for providing such more favorable rate (if any), then Aurobindo shall pay the more favorable rate in place of the Royalty Rate. For the sake of clarity, the Minimum $██████ Payment is not subject to the most favored nations provision of this section 6.1(a). Shionogi's right to receive a share of Profits under this Section 6.1(a) shall expire upon the expiration, cancellation, invalidation or abandonment (whichever comes first) of the last Valid Claim.  (Id. at 1–2.)

On the same day, Mr. Bassett sent Mr. Moore an e-mail that stated the following:

Shionogi can accept your client's latest counterproposal.  Toward that end, we will prepare and send to you a revised settlement agreement incorporating these terms for execution by your client.  Shionogi will be prepared to sign that agreement, as well.  Teva/Andrx, as you may know, is subject to a consent decree with the FTC, and there may be some delay in its ability to sign the agreement as a result, but we will figure that out.  In the meantime, we will prepare the joint claim construction filing for Monday, but you and I can separately discuss whether any other deadlines in the litigation or the IPR need to be postponed while we are finalizing the settlement.  (Id. at 1.)

Several parts of the language in the above e-mail are important to highlight.  First, Mr. Bassett used the phrase "can accept" as it relates to Mr. Moore's/Aurobindo's April 27, 2018 E-

mail.  Second, Mr. Bassett added several material terms to the settlement discussions, which included acknowledging that other parties (i.e., Teva and Andrx) would have to sign the agreement.  Four hours later, Mr. Moore sent an e-mail to Mr. Bassett that stated: "This is great – finally."  (Id.)

On April 30, 2018, Mr. Bassett sent Mr. Moore "a revised draft of the settlement agreement in the Shionogi v. Aurobindo litigation, incorporating the terms we agreed to on Friday."  Mr. Bassett advised that, "[o]nce we fill in the effective date, insert the address for the defendants in the notice provision (Section 11.9), and complete the exhibits, this should be ready for execution by the parties."  Mr. Bassett also asked for Aurobindo's address to be used in the notice provision so that Mr. Bassett could "prepare an execution copy of the settlement agreement."  (Id. Ex. 5, at 4–5.)

On May 6, 2018, Mr. Moore provided the requested address for Aurobindo and relayed Aurobindo's questions:

> Aurobindo has asked:
>
> 1. for clarification as to whether the royalty and minimum payment are based on the actual launch of the product rather than the earliest launch date (███████ ███).
>
> 2. They feel that as all the cards are in the hands of Shionogi as to what Aurobindo can ultimately make in a quarter given others on the market already, that the agreement should allow for an escape clause if Aurobindo does not generate at least ███ million in Net Sales for two consecutive quarters (of course they are still amenable to paying the ███ of Net Sales if Shionogi decides it is their interest to keep the agreement going).  Id. at 3–4.)

On May 7, 2018, Mr. Bassett sent an e-mail to Mr. Moore advising that the May 6, 2018 response was "unacceptable," providing the following explanation:

> The parties have been negotiating settlement terms for many months, and as of last month, there were only two outstanding terms on which the parties needed to reach

agreement:  the 'License Start Date' and the 'Royalty.'  On April 27, 2018, you made a written proposal on behalf of Aurobindo as to both of those terms and, on the same day, I wrote to you accepting those proposals on behalf of Shionogi (see attached email exchange).  As a result, the parties have a binding, enforceable agreement incorporating those terms offered by your client on April 27.

If there were any ambiguity whatsoever that Aurobindo's offer and Shionogi's acceptance on April 27 formed a binding agreement – and there is not – your response to my April 27 email accepting Aurobindo's offer clears up that ambiguity: "This is great – finally." (Again, see attached email exchange).  Based on that clear, unambiguous email exchange, we sent you a draft of a full written settlement agreement on April 29, 2018, which only had blanks for three, nonsubstantive provisions (the effective date; the address for the defendants in the notice provision (Section 11.9); and the final exhibits (a standard stipulation of dismissal, a joint motion to terminate proceedings, and a joint request to file the settlement documents as confidential)).  That April 29 draft was virtually identical to the near-final written agreement we had sent to you over three months earlier on January 19, 2018.

* * *

More specifically, the "License Start Date" to which the parties have agreed could not be clearer:  it is the earliest of either ███████████ or the date on which the asserted patents expire or are found invalid/unenforceable.  There is no provision for, or reference to, "the actual launch of the product."  Therefore, absolutely no clarification is needed as to "whether the royalty and minimum payment are based on the actual launch of the product rather than the earliest launch date (███████████)."

* * *

We will now prepare the final, executable version of the Settlement Agreement incorporating the terms to which the parties previously agreed, that I will then forward to you for your client's signature.  To be clear, however:  the parties already have a binding agreement on the terms set forth above, and we will not hesitate to bring this to the attention of the Court if your client delays any further in finalizing the written memorialization of that existing agreement.  (Id. at 2–3.)

Later on May 7, 2018, Mr. Moore responded to Mr. Bassett's e-mail with an additional question: "Can you confirm the ███████ minimum includes both strengths, and is not ███████ for each strength?"  (Id. at 2.)  On May 8, 2018, Mr. Bassett responded that "the $███████ expressly includes both strengths that are the subject of the Aurobindo ANDA."  (Id.)  That same day, Mr. Moore sent an e-mail to Mr. Bassett inquiring about deposition logistics "[a]s it is not clear that we will settle before the deposition."  (Id. Ex. 7, at 3.)  Mr. Bassett's co-counsel, David

9

Cavanagh, responded to Mr. Moore stating that the deposition would not be necessary, given Shionogi's position . . . that the parties have already reached agreement on binding settlement terms as of April 27, 2018, and that the parties are now merely negotiating the memorialization of that binding agreement." (Id.)

On May 9, 2018, Mr. Bassett sent the "final, executable version of the Settlement Agreement" and instructed that Mr. Moore should return the document to him "for execution by Shionogi and by Andrx and Teva." (Id. Ex. 5, at 1.) The May 9, 2018 Draft Agreement contained fifty-one pages, including signature pages and the following exhibits: (1) Stipulated motions for dismissal of this pending action with prejudice, (2) Joint motions to terminate the IPR Proceedings between Andrx and Aurobindo, and (3) Joint Request that the Settlement Agreement be treated as Business Confidential Information. (Id. Ex. 6.) The joint motions to terminate the IPR Proceedings between Andrx and Aurobindo listed David Cavanugh, Esq. as Counsel for Andrx, whereas the stipulated motions for dismissal of this federal action listed Stephen Brauerman, Esq. and Sara Bussiere, Esq. from Bayard, P.A. as Counsel for Andrx. (Id. at 21–31.) Like the January 19, 2018 Draft Agreement, this Agreement stated that the "parties" to the agreement were Shionogi, Andrx, Teva, and Aurobindo. (Id. at 1.)

Further, the May 9, 2018 Draft Agreement mirrored the language from the January 19, 2018 Draft Agreement, providing for the voluntary withdrawal of this lawsuit, the IPR Proceedings, and all existing legal and equitable claims existing at the time of the Agreement that relate to Aurobindo's ANDA, the '459 and '866 Patents, current pending litigation, or Aurobindo's generic product. (Id. at 6–8.) The Agreement contained a ██% royalty rate, Minimum Payment of $██████ to be paid quarterly through the earlier of ████████, expiration of the '459 and '866 Patents, or termination of the Agreement. (Id. at 4, 11–12.)

On May 10, 2018,  Mr. Moore wrote an e-mail to Mr. Cavanagh and Mr. Bassett:

> We entirely disagree that the case is over, and that there were "only two outstanding terms on which the parties needed to reach agreement:  the 'License Start Date' and the 'Royalty.'"  We also disagree that my expression of relief that the parties seemed to be in alignment on these two items, indicated that the company itself was signing off on all terms previously proposed.  I have made it eminently clear in the past that only the client itself had the ability to bind itself, not me. Please note no consideration passed even with respect to the so called contract that you state arose with respect to the proposal made with respect to these two terms (royalty and date).  (Id. Ex. 7 at 2.)

Several other e-mails were exchanged on May 10, 2018 regarding the disagreement of whether parties had reached a settlement agreement.  (Id. at 1–2.)

### C.  The July 19, 2018 Oral Argument

On July 19, 2018, I presided over an oral argument regarding Plaintiffs' Motion to Enforce Settlement.  Brett McCartney, Esq. represented Andrx.  Mr. Bassett spoke on behalf of Shionogi, and James Nealon, Esq. spoke on behalf of Aurobindo.  (Oral Arg. Tr. 1–6, July 19, 2018.)  During the oral argument, several representations were made by Counsel, which are pertinent to my analysis.

### 1.  The Relevant Parties

Shionogi was asked through Mr. Bassett to explain how it is possible to have a comprehensive settlement proposal that included another party that had not been part of the e-mail communications.  (Id. 7.)  Mr. Bassett responded that "Shionogi is the exclusive licensee of the patents that are asserted here . . . I was representing Shionogi, during those negotiations, however we kept Andrx informed because they're the owners of the patent, but Shionogi has the essentially unfettered right . . . to sublicense."  (Id.)  Mr. Bassett acknowledged, however, that the e-mail record before me did not mention that Andrx was informed in any way about the settlement.  (Id. 7–8.)  Mr. Bassett insisted that Andrx's assent to the Agreement was immaterial because Shionogi

11

was permitted to enter into a unilateral contract with Aurobindo using its unencumbered ability to enter into sublicense agreements with third parties.  (Id. 7–9.)  When asked to explain why there was a signature line for Andrx on the Agreement, Mr. Bassett stated that the signature line was "not legally relevant because Aurobindo settling with Shionogi ends the litigation."  (Id. 10–11.)  Mr. Bassett was unable to provide facts from the record to support this argument.  (Id.)

On behalf of Aurobindo, Mr. Nealon posited that he was unaware whether Shionogi's license agreement permitted it to unilaterally enter into a settlement agreement because Aurobindo has "never laid eyes" on the license agreement.  (Id. 25–26.)  Mr. Nealon emphasized that, even if this license agreement did permit Shionogi to unilaterally enter into a settlement agreement, the formalities of the draft Agreements clearly indicate that Andrx (and Teva) needed to sign and agree because every draft Agreement contained signature lines for Andrx and Teva: "You need all four parties and until you have four parties, you have no binding agreement."  (Id. 20–22, 27, 33.)

Mr. Nealon emphasized that the e-mail chain of record further reflected the need for the approval of both Andrx and Teva, especially considering that Mr. Bassett advised Mr. Moore in April that there would be some delay in Andrx and Teva signing the Agreement due to a consent decree.  (Id. 34.)  Mr. Nealon also pointed out that Andrx was an essential party to any settlement agreement because all of the Agreement drafts contained essential terms that Aurobindo and Andrx (the patent holder) would enter into joint stipulations to dismiss the pending lawsuits.  (Id. 33–34.)

## 2.   Offer and Acceptance

When asked to identify the "acceptance" language in his April 27, 2018 E-mail, Mr. Bassett pointed to language stating: "Shionogi can accept your client's latest counterproposal."  (Id. 16.)  Mr. Bassett acknowledged that there is a difference between the words "can" and "will," but insisted that he colloquially meant "we were not happy with this proposal, but we can live with it.

We can accept that." (Id. 17.)  Mr. Bassett conceded that this language could have been drafted more clearly, but "thought we had an easy arrangement and we had reached an agreement." (Id. 18.)  Mr. Bassett argued that Aurobindo accepted all of the other terms included in Shionogi's January 19, 2018 Draft Agreement because Aurobindo responded to this proposal by re-negotiating only the financial terms of the agreement without mentioning any other provision. (Id. 18–19.)

On behalf of Aurobindo, Mr. Nealon responded that the e-mails of record demonstrated that negotiations occurred "from February 2017 to December that seemingly go nowhere." (Id. 19–20.)  Given that the e-mail exchanges reflect no progress between November 2017 and January 2018, Mr. Nealon argued that it is unclear why Mr. Bassett sent an e-mail in January of 2018 stating that the parties had "reached agreement on all terms" and attached a full settlement draft. (Id. 20–21.)  Mr. Nealon explained that Mr. Moore restarted the settlement negotiations in April of 2018 by focusing on "a couple of specific narrow issues that [we]re of importance." (Id. 22.)  During the communications in April of 2018, "nowhere, you can read that e-mail record back and forth, you could read it all day long, you're not going to find anywhere in January, February, March, or April where Mr. Moore once says oh, yes, by the way, there's only one issue left, it's that one." (Id.)

When asked why Mr. Moore didn't clarify that there were other issues outstanding, Mr. Nealon conceded that "[b]oth of [the parties] maybe could have handled that communication better" but noted that they were "a cryptic two ships that passed in the night . . . operating from very different mindsets." (Id. 22–23.)  Regarding Mr. Moore's response to Mr. Bassett's April 27, 2018 E-mail that stated "[t]his is great, finally," Mr. Nealon asserted that the parties had made

some progress on key issues and were anticipating continued negotiations, whereby Aurobindo would have an opportunity to review and respond to the next written draft. (Id. 29–30.)[3]

## II.     LEGAL STANDARDS

### A.  Motion to Enforce Settlement

A district court has jurisdiction to enforce a settlement agreement entered into by litigants in a case pending before it. See Leonard v. Univ. of Del., 204 F. Supp. 2d 784, 786 (D. Del. 2002) (citing Tieman v. Devoe, 903 F.2d 1024, 1031–32 (3d Cir. 1991)). A motion to enforce a settlement agreement resembles a motion for summary judgment and employs a similar standard of review. Parker-Hannifin Corp. v. Schlegel Elec. Materials, Inc., 589 F. Supp. 2d 457, 461 (D. Del. 2008).

### B.  Necessity of a Hearing

A court may grant a motion to enforce settlement without a hearing only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In doing so, the court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). However, the mere existence of some contrary evidence is insufficient to necessitate a hearing; rather, the evidence must be sufficient to enable a factfinder to find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Where,

---

[3]     After hearing oral argument on July 19, 2018, I recommended that Plaintiffs withdraw their Motion to Enforce Settlement Agreement without prejudice and engage in further settlement discussions. (Id. 37–40.) On July 24, 2018, I issued an Order dismissing Plaintiffs' Motion to Enforce Settlement without prejudice. (Doc. No. 89.) On August 1, 2018, I referred the case to Magistrate Judge Sherry Fallon for settlement purposes. (Doc. No. 90.) After the settlement mediation failed, Plaintiffs filed their Renewed Motion to Enforce Settlement Agreement. (Doc. No. 94, 95.) On October 31, 2018, Aurobindo responded to Plaintiffs' Renewed Motion. (Doc. No. 99, 100.)

however, the motion turns on disputed issues of fact, the court should hold an evidentiary hearing to determine the movant's entitlement to relief.  Tiernan v. Devoe, 923 F.2d 1024, 1031 (3d Cir. 1991).

During the July 19, 2018 Oral Argument on the Motion to Enforce, I asked counsel whether I could make factual findings based upon the e-mail exchanges alone.  The only suggested additional evidence (aside from the negotiators' subjective beliefs, which are irrelevant to contract formation) was Aurobindo's contention that there is an industry custom in Hatch-Waxman litigation that no agreement is binding until reduced to writing and signed by the clients.  Because this contention, even if true, would not affect the outcome of the Motion, I find that an evidentiary hearing is not needed, and this dispute can be decided on the documents alone.

### C.  Contract Analysis

The Third Circuit generally "encourage[s] attempts to settle disagreements outside the litigative context" and has held that "[a] settlement agreement is a contract and is interpreted according to local law."  Wilcher v. City of Wilmington, 139 F.3d 366, 372 (3d Cir. 1998); Shell's Disposal and Recycling, Inc. v. City of Lancaster, 504 F. App'x 194, 200 (3d Cir. Nov. 16, 2012). "Basic contract principles apply to settlement agreements."  Williams v. Metzler, 132 F.3d 937, 946 (3d Cir. 1997).

The parties agree that the issue of whether a valid contract was formed must be decided under Delaware law.  Under Delaware law, "a contract consists of an offer and acceptance."  Grasso v. First USA Bank, 713 A.2d 304, 308 (Del. Super. Ct. 1998).  "An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it."  Id. (quoting RESTATEMENT (SECOND) OF CONTRACTS § 24).  "To be effective, the acceptance must be identical

to the offer." Id. (citing Friel v. Jones, 206 A.2d 232, 233 (Del. Ch. 1964), aff'd, 212 A.2d 609 (Del. 1965); RESTATEMENT (SECOND) OF CONTRACTS §§ 58–59).

In evaluating the offer and acceptance, the Delaware Supreme Court has held that "a valid contract exists when (1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration." Eagle Force Holdings, LLC v. Campbell, 187 A.3d 1209, 1212–13 (Del. 2018) (quoting Osborn ex rel. Osborn v. Kemp, 991 A.2d 1153 (Del. 2010)).

Whether the parties intended to be bound by a contract is a question of fact. Eagle Force, 187 A.3d at 1213. Under Delaware law, "overt manifestation of assent—not subjective intent—controls the formation of a contract." Black Horse Capital, LP v. Xstelos Holdings, Inc., 2014 WL 5025926, at *12 (Del. Ch. Sept. 30, 2014) (quoting Indus. Am., Inc. v. Fulton Indus., Inc., 285 A.2d 412, 415 (Del. 1971)). "[I]n applying this objective test for determining whether the parties intended to be bound, the court reviews the evidence that the parties communicated to each other up until the time that the contract was signed—i.e., their words and actions—including the putative contract itself." Eagle Force, 187 A.3d at 1229–30. While a contract "in the form of a signed writing . . . generally offers the most powerful and persuasive evidence of the parties' intent to be bound," the court may consider evidence of the parties' prior or contemporaneous agreements and negotiations in evaluating whether the parties intended to be bound by the agreement." Id. at 1230. In Eagle Force, the Delaware Supreme Court remanded the case to the trial court to determine whether the parties intended to be bound by a written contract because there was conflicting evidence where both parties signed the written agreement and the agreement was notarized, but the agreement contained a "DRAFT" notation and blank schedules. Id. at 1231.

16

Whether a contract contains material terms that are sufficiently definite is a matter of law. Id. at 1232.  Delaware has adopted "the test from Restatement (Second) of Contracts § 33(2), which suggests that terms are sufficiently definite if they 'provide a basis for determining the existence of a breach and for giving an appropriate remedy.'"  Id. (quoting RESTATEMENT (SECOND) OF CONTRACTS § 33(2)).

Whether the parties exchanged legal consideration is a limited inquiry: "we limit our inquiry into consideration to its existence and 'not whether it is fair or adequate.'"  Osborn ex rel. Osborn v. Kemp, 991 A.2d 1153, 1158–59 (Del. 2010).  Plaintiffs, as the parties asserting the existence of a contract, bear the burden of proving the contract's formation by a preponderance of the evidence.  Williams v. Chancellor Care Ctr. of Delmar, No. 06C05146MMJ, 2009 WL 1101620, at *3 (Del. Super. Ct. Apr. 22, 2009).

## III.     ANALYSIS

Plaintiffs contend that the April 27, 2018 E-mails formed a binding contract between the parties. Defendants respond that neither Mr. Moore's April 27, 2018 E-mail, nor Mr. Bassett's April 27, 2018 Reply were definite enough to constitute an offer or acceptance.  Defendants further argue that a contract could not be formed without the assent of Andrx, who was completely absent from the negotiating table.  Defendants present three additional arguments that there was no settlement agreement: (1) Mr. Moore's April 27, 2018 E-mail could not constitute an offer because it did not communicate agreement with Shionogi's proposed ███ termination period (a material term of the contract); (2) the parties understood that neither party would be bound until execution of a final written agreement, and (3) Mr. Moore did not have authority to settle on behalf of Aurobindo.

In evaluating the offer and acceptance, I must determine whether the parties intended to be bound by the April 27, 2018 E-mails.  Eagle Force Holdings, LLC v. Campbell, 187 A.3d 1209, 1212–13 (Del. 2018) (quoting Osborn ex rel. Osborn v. Kemp, 991 A.2d 1153 (Del. 2010)).  In making this determination, I will consider the April 27, 2018 E-mails on their face, as well as the parties' communications with each other leading up to the April 27, 2018 E-mails, which began in February of 2017.  Id. at 1229–30.

Upon consideration of all the e-mails, and, in particular, the April 27, 2018 E-mails, I conclude that there was no legally binding offer and acceptance, such that the terms were "sufficiently definite" to provide a basis to hold that a binding settlement had be reached. However, even if there was a binding offer and acceptance between Shionogi and Aurobindo, I nonetheless also find that there was not an enforceable contract between all parties because Andrx never provided the necessary assent.

### A. Mr. Moore's April 27, 2018 E-mail Was Not Sufficiently Definite Enough to Constitute an Offer

Mr. Moore's April 27, 2018 E-mail contained the following subject line: "RE: 4-17-2018 1002 am EST COUNTEROFFER - SUBJECT TO FEDERAL RULE OF EVIDENCE 408 - Shionogi Inc., et al. v. Aurobindo Pharma Ltd., et al., Civil Action No. 1:17-cv-00072-MSG (D. Del.)."  (See supra at 6–7.)  As was the case with the other e-mails in the previous months, the two attorneys involved in this exchange did not specify whether this communication was meant as a binding offer, which could, if accepted, lead to a binding agreement.  In fact, Mr. Moore's April 27, 2018 E-mail began with "Here we go, David."  This phrase could plausibly imply continuing negotiations, or perhaps an introduction to what would lead to a binding offer.  These neutral introductory words do not clearly establish that the April 27, 2018 E-mail, standing alone, manifested an intent to be bound.

18

Because the April 27, 2018 E-mail is ambiguous, I may also look to the correspondence between the parties leading up to the April 27, 2018 E-mail for context in determining whether a binding "offer" occurred.  As described above, the parties began negotiations on February 10, 2017, but did not begin meaningful negotiation discussions until September 13, 2017.  (See supra at 2.)  From September 13, 2017 to December 11, 2017, the parties engaged in preliminary negotiations that focused on four terms: (1) Aurobindo's entry date into the market, (2) the royalty rate, (3) the terms of a quarterly payment, and (4) a notice provision in the event that Aurobindo withdrew from the United States market.  (See supra at 2–4.)  These e-mail negotiations used terms that included "counteroffer," "proposal," "counter-proposal," and sometimes provided no descriptive term at all.  At no point during these communications did either party indicate whether they anticipated receiving a formal offer or were just furthering the negotiations by responding. (Id.)

The parties ceased negotiations for over a month, until Mr. Bassett abruptly sent an e-mail on January 19, 2018, stating that "Shionogi believe[d] that the parties [were] close enough on the terms of settlement that [Shionogi had] drafted a proposed settlement agreement."  Although Mr. Bassett indicated that Shionogi was "ready to sign this agreement with Aurobindo," the agreement contained a "draft for discussion purposes" stamp.  The draft agreement also listed Andrx and Teva as additional parties to the contract and contained signature lines for each, but neither Andrx nor Teva was not copied on any of these communications.  For three months following this e-mail, Aurobindo did not respond to this proposal.  (See supra at 4–5.)

On April 12, 2018, Mr. Moore apparently restarted negotiations by sending an e-mail proposal to Mr. Bassett, which mirrored the e-mail exchanges that had occurred between September and December of 2017.  This April 12, 2018 proposal was an edited version of just two

sections contained in the January 19, 2018 Draft Agreement: (1) the licensed start date was changed from ████████ to ████████, and (2) the royalty was changed to "the lower of (i) ██% of all Profit during such three month period (the "Royalty Rate") or (ii) $████." The parties continued to exchange versions of these two provisions over the next several days. (See supra at 5.)

On April 17, 2018, Mr. Moore sent "yet another counterproposal" to Mr. Bassett, which edited the same two sections as the April 12, 2018 e-mail: (1) the licensed start date was changed from ████████ to ████████, and (2) the royalty was changed to "the higher of (i) ██% of all Profit during such three month period (the "Royalty Rate") or (ii) $████ provided Aurobindo's Net Sales are at least ████ in such three month period." (See supra at 5–6.) The next day, on April 18, 2018, Mr. Bassett sent an e-mail to Mr. Moore with "a counterproposal from Shionogi" that agreed to the License Start Date of ████████, but changed the minimum payment to $████ per quarter without the "net sales condition." (See supra at 6.) After receiving no response from Mr. Moore for over a week, Mr. Bassett sent an e-mail to Mr. Moore asking if Aurobindo would be responding to "Shionogi's counterproposal." (Id.)

Based on this history, it is entirely unclear whether Mr. Moore's April 27, 2018 E-mail beginning "Here we go David" was an offer to enter into a contract. Viewed in the light most favorable to Aurobindo, the April 27, 2018 E-mails leading up to this alleged offer demonstrate that the parties were continuing to negotiate and never distinguished whether they anticipated receiving a formal offer or were merely responding to continued negotiations that had been ongoing on-and-off for fourteen months. (See supra at 3–6.) And, the April 27, 2018 E-mails only discussed two terms of the original twenty-four page draft agreement that Shionogi had drafted in January of 2018, which clearly stated "DRAFT FOR DISCUSSION." (Id. 3, 7.)

20

Given all of the above, I conclude that Mr. Moore's April 27, 2018 E-mail beginning "Here we go David" was not an offer, which, if accepted, could create a binding settlement.

### B.   Even If an Offer Was Tendered, Mr. Bassett's April 27, 2018 E-mail Was Not an Acceptance

Even if Mr. Moore's April 27, 2018 E-mail constituted a legally binding offer, a contract would not be formed unless Mr. Bassett's April 27, 2018 E-mail was an acceptance. As described above, Mr. Bassett's April 27, 2018 E-mail stated:

> Shionogi can accept your client's latest counterproposal. Toward that end, we will prepare and send to you a revised settlement agreement incorporating these terms for execution by your client. Shionogi will be prepared to sign that agreement, as well. Teva/Andrx, as you may know, is subject to a consent decree with the FTC, and there may be some delay in its ability to sign the agreement as a result, but we will figure that out. In the meantime, we will prepare the joint claim construction filing for Monday, but you and I can separately discuss whether any other deadlines in the litigation or the IPR need to be postponed while we are finalizing the settlement. (See supra at 7.)

The statement that Shionogi "can accept" the proposal could be read several ways. Indeed, during the Oral Argument, Mr. Bassett acknowledged that this statement is less definite than "Shionogi does accept." (See supra at 13–14.) [4]

The remainder of this e-mail strongly suggests that it is not an acceptance, but rather further terms to be negotiated. Mr. Bassett indicates that Andrx, a party to the lawsuit and the patent holder, would not assent until some indefinite time in the future—a potentially significant fact, given that the proposed licensing start date was then less than ███████ away. Additionally, the April 27, 2018 E-mail states that the scheduled litigation would continue, and that scheduled

---

[4]      Courts have found that a statement that the clients "are willing to settle on the general basis contained in your faxed message" showed an intent to be bound. See Clark v. Ryan, No. 628-K, 1992 WL 163443, at *3 (Del. Ch. June 17, 1992) (emphasis added). However, this language indicating a clear intent to settle the case is distinguishable from the language used here (i.e., "Shionogi can accept your client's latest counterproposal).

litigation dates may need to be postponed, but not terminated.[5]  While the April 27, 2018 E-mails show that the parties had reached agreement on two of the settlement terms under discussion, contract formation requires more than harmony of positions, as the parties must also intend to be bound.  See Tel. & Data Sys., Inc. v. Eastex Cellular L.P., No. 12888, 1993 WL 344770, at *10 (Del. Ch. Aug. 27, 1993); 2 WILLISTON ON CONTRACTS § 6:10 (4th ed.).

Plaintiffs further argue that Mr. Moore's response—"This is great—finally"—establishes that he understood that a deal had been reached.  (See supra at 7.)  It is unclear whether this statement references assent to a final contract or just certain terms.  And, whether Mr. Bassett's reply was an acceptance is an objective inquiry, and does not depend on what Mr. Moore subjectively understood the reply to mean.  Based on the facts before me, I conclude that, even if Mr. Moore's April 27, 2018 E-mail was an offer, Mr. Bassett's April 27, 2018 Reply was not an acceptance.  Absent an acceptance by Shionogi, no contract was formed.

### C.  There Can Be No Settlement without Andrx

Defendants further argue that no agreement could be formed without the assent of Andrx, the patent holder, and that such assent was never given.  Plaintiffs acknowledge that Andrx never agreed to settle this matter, but argue that Shionogi and Aurobindo could form a binding contract between themselves, which would, in effect, terminate the litigation even as to Andrx's infringement claims.  Defendants make a similar argument about nonparty, Teva, who apparently

---

[5]      This language could reflect caution on Shionogi's part not to abandon the litigation until this Court formally dismissed it.  Compare Loppert v. WindsorTech, Inc., 865 A.2d 1282, 1287 (Del. Ch. 2004), aff'd, 867 A.2d 903 (Del. 2005) ("Until a dismissal, stay, or new scheduling order was submitted to and granted . . ., plaintiff had every right to expect defendant to adhere to the existing scheduling order." (emphasis in original); with Clark, 1992 WL 163443, at *3 (finding that there was acceptance where the party stated that, because settlement was "inevitable," the party did "not plan to submit . . . a brief as directed," and requested that the counterparty "do the same").  But again, the language in question must be read in conjunction with other language reflecting the need for Andrx's assent.

now owns Andrx.  I agree with Defendants that the agreement under discussion necessarily contemplated participation by Andrx and Teva.

Andrx as the patent holder was understood to be an essential party to the contract.  On April 27, 2018, Mr. Bassett informed Mr. Moore that both Teva and Andrx would need to sign the Agreement.  (See supra at 7.)  On May 9, 2018, Mr. Bassett sent the "final, executable version of the Settlement Agreement" and instructed that Mr. Moore should return the document to him "for execution by Shionogi and by Andrx and Teva."  (See supra at 4, 11.)  Both the January 18, 2018 and May 2018 Draft Agreements contained signature lines for Shionogi, Andrx, Aurobindo, and Teva, and named them as parties to the Agreements.  (Id.)  At no point during the negotiations did Mr. Bassett state that he represented Andrx, and the legal documents listed other individuals as counsel for Andrx.  (See supra at 11.)

When Mr. Bassett was asked to explain how it is possible to have a comprehensive settlement proposal that included another party that had not been part of the e-mail communications, he responded that "Shionogi is the exclusive licensee of the patents that are asserted here . . . I was representing Shionogi, during those negotiations, however we kept Andrx informed because they're the owners of the patent, but Shionogi has the essentially unfettered right . . . to sublicense."  (See supra at 11–13.)  But, Mr. Bassett offered no factual proof that he kept Andrx informed, nor have Plaintiffs produced written documents establishing that he had the authority to bind both Shionogi and Andrx.  While I do not imply that Mr. Bassett's representations were inaccurate, I find that more is needed.[6]  Plaintiffs have the burden to prove a binding settlement and representations from counsel that are not subject to cross examination and premised

---

[6]      Before proceeding on his motion, Mr. Bassett was cautioned as to whether he should be arguing the motion and, at the same time, relying on e-mail evidence that he created.  (Oral Arg. Tr. 3-6, July 19, 2018.)

on argument are not sufficient.  When asked to explain why there was a signature line for Andrx on the Agreement, Mr. Bassett argued that the signature line was "not legally relevant because Aurobindo settling with Shionogi ends the litigation." (Id.)  But again, Plaintiffs have not provided facts or law to support this argument.  (Id.)

Finally, the record before me reflects that Andrx, as the patent holder, was an essential party because all of the Agreement drafts contained the essential terms that Aurobindo and Andrx would enter into joint stipulations to dismiss the pending lawsuits.  (See supra at 4–7, 11–13.) Both the January 19, 2018 and May 2018 Draft Agreements provided for the voluntary withdrawal of this lawsuit, the IPR Proceedings, and all existing legal and equitable claims existing at the time of the Agreement that relate to Aurobindo's ANDA, Andrx's '459 and '866 Patents, current pending litigation, or Aurobindo's generic product.  (Id.)  Because Andrx owns the patents that form the basis for the present infringement suit, Andrx could maintain the present lawsuit over Shionogi's objection, and notwithstanding Shionogi's purported settlement with Defendants, unless it was contractually prevented from doing so.

While it is possible for two parties to make a contract that is binding between themselves even though it is contingent on approval by a third party, there is no indication that that is what happened here.  See RESTATEMENT (SECOND) OF CONTRACTS § 59 cmt. b, illus. 2.  None of the communications of record reflect that Mr. Moore and Mr. Bassett discussed a timeline for seeking Andrx's approval or considered how negotiations would proceed should Andrx decline.  As the negotiations over the licensing start date show, the timing of the licensing period was material, and an indefinite future contingency on Andrx's approval would be inconsistent with the schedule envisioned by the draft agreement.  (See supra at 4–7, 11–13.)

I therefore find that the April 27, 2018 E-mails contemplated a settlement in which Andrx would participate, subject to its approval, and that any settlement would not become binding until Andrx assented.  This is consistent with the above conclusion that the April 27, 2018 E-mails were not an offer and acceptance, because objectively the negotiators understood that the deal remained tentative until Andrx joined the discussion.  I therefore find that Andrx's absence also precludes Plaintiffs from meeting their burden to show an enforceable contract, and that Plaintiffs' Motion must therefore be denied.

## IV.     CONCLUSION

For all of the reasons set forth above, Plaintiffs' Motion to Enforce Settlement Agreement will be denied.

An appropriate order follows.